# EXHIBIT A



1  Michael P. Lehmann  (77152; mlehmann@cmht.com)
   **COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
2  One Embarcadero Center
   Suite 2440
3  San Francisco, CA  94111
   Telephone:  (415) 623-2047
4  Facsimile:   (415) 433-5994

5  Michael D. Hausfeld  (mhausfeld@cmht.com)
   Charles E. Tompkins  (ctompkins@cmht.com)
6  James J. Pizzirusso (jpizzirusso@cmht.com)
   Hilary K. Ratway (209451; hratway@cmht.com)
7  Andrea L. Hertzfeld  (ahertzfeld@cmht.com)
   **COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
8  1100 New York Avenue, NW
   West Tower, Suite 500
9  Washington, DC 20005
   Telephone:  (202) 408-4600
10 Facsimile:   (202) 408-4699            E-filing

11 *Attorneys for Plaintiffs and the Class*
   *(Additional counsel listed on signature page)*

12

13               **UNITED STATES DISTRICT COURT**
                 **NORTHERN DISTRICT OF CALIFORNIA**        MEJ
14

15
   RACHEL DILLER and TRONG
16 NGUYEN, individually and on behalf of          No.
   others similarly situated;                CV  07        6394
17

18                    Plaintiffs,

19        v.                                 **CLASS ACTION COMPLAINT**

20 AIR NEW ZEALAND LIMITED;
   ALL NIPPON AIRWAYS COMPANY,                **JURY TRIAL DEMANDED**
21 LIMITED; CATHAY PACIFIC
   AIRWAYS LIMITED; CHINA AIRLINES
22 LIMITED; EVA AIRWAYS
   CORPORATION; JAPAN AIRLINES
23 INTERNATIONAL COMPANY,
   LIMITED; MALAYSIA AIRLINES
24 SYSTEM BERHAD; NORTHWEST
   AIRLINES CORPORATION;
25 SINGAPORE AIRLINES LIMITED;
   THAI AIRWAYS INTERNATIONAL
26 PUBLIC COMPANY, LIMITED,

27                    Defendants.

28

1    Plaintiffs Rachel Diller and Trong Nguyen ("Plaintiffs"), by and through her undersigned

2  attorneys, complain and allege as follows:

3  ## NATURE OF THE ACTION

4    1.    The above-named defendants (collectively "Defendants") are large, international

5  passenger air carriers servicing many of the same trans-Pacific routes to and from the United

6  States. Beginning no later than January 1, 2004 and continuing until the present (the "Class

7  Period"), Defendants engaged in a conspiracy to fix, raise, maintain, and/or stabilize passenger

8  fares and/or fuel surcharges for trans-Pacific passenger air transportation services to and from the

9  United States, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

10    2.    Plaintiffs, purchasers of passenger air transportation services from Defendants,

11  paid artificially inflated prices for such services and thereby suffered pecuniary injury as a result

12  of Defendants' unlawful conduct. Plaintiffs bring this action as a class action on behalf of all

13  other similarly situated purchasers of passenger air transportation services.

14  ## JURISDICTION AND VENUE

15    3.    This complaint is filed under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C.

16  §§ 15, 22, and 26, to obtain treble damages and injunctive relief for violation of Section 1 of the

17  Sherman Act, 15 U.S.C. § 1.

18    4.    This Court has original federal question jurisdiction over the Sherman Act claim

19  asserted in this complaint under 28 U.S.C. § §1331, 1337 and 1367 and Sections 4 ,12, and 16 of

20  the Clayton Act, 15 U.S.C. §§ 15, 22, and 26.

21    5.    Venue is proper in this District pursuant to Sections 4(a), 12, and 16 of the Clayton

22  Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside,

23  transacts business, are found within, and/or have agents within this District and a substantial part

24  of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected

25  interstate trade and commerce described below has been carried out in this District.

26    6.    This Court has personal jurisdiction over Defendants because, *inter alia,* each: (a)

27  transacted business in this District; (b) directly or indirectly sold and delivered passenger air

28

-2-                    CLASS ACTION COMPLAINT

1    transportation in this District; (c) has substantial aggregate contacts with this District; and (d)

2    engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of

3    causing injury to, persons and entities residing in, located in, or doing business in this District.

4                                              **PLAINTIFFS**

5        7.    Plaintiff Rachel Diller is an individual resident of San Francisco, California.

6    During the Class Period, Plaintiff Diller purchased air transportations services from one of more

7    of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged

8    herein.

9        8.    Plaintiff Trong Nguyen is an individual resident of Seattle, Washington. During

10    the Class Period, Plaintiff Diller purchased air transportations services from one of more of the

11    Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

12                                              **DEFENDANTS**

13        9.    Defendant Air New Zealand Limited ("Air New Zealand") is a New Zealand

14    company with its principal place of business located at 19 Quay Tower, 29 Customs Street West,

15    Auckland, 1020 New Zealand. Air New Zealand conducts passenger air transportation

16    throughout the world. During the Class Period, Air New Zealand sold air passenger fares to and

17    from the United States and this District.

18        10.    Defendant All Nippon Airways Company, Limited. ("ANA") is a Japanese

19    company with its principal place of business located at Shidome-City Center, 1-5-2, Higashi-

20    Shimbashi Minato-ku, Tokyo 105-7133, Japan. ANA conducts passenger air transportation

21    throughout the world. During the Class Period ANA sold air passenger fares to and from the

22    United States and this District.

23        11.    Defendant Cathay Pacific Airways Limited ("Cathay Pacific") is a Hong Kong-

24    based company with its principal place of business located at 5/F, South Tower, Cathay Pacific

25    City, 8 Scenic Rd., Hong Kong International Airport, Lantau, Hong Kong. Cathay Pacific

26    conducts passenger air transportation throughout the world. During the Class Period Cathay

27    Pacific sold air passenger fares to and from the United States and this District.

28

CLASS ACTION COMPLAINT

12.    Defendant China Airlines Limited ("China Airlines") is a Taiwanese company with its principal place of business located at 131 Nanking East Rd., Section 3, Taipei, Taiwan. China Airlines conducts passenger air transportation throughout the world. During the Class Period, China Airlines sold air passenger fares to and from the United States and this District.

13.    Defendant EVA Airways Corporation ("EVA") is a Taiwanese company with its principal place of business located at 117, Sec. 2, Chang-An E. Rd., Taipei, 104, Taiwan. EVA conducts passenger air transportation throughout the world. During the Class Period, EVA sold air passenger fares to and from the United States and this District.

14.    Defendant Japan Airlines International Company, Limited ("JAL") is a Japanese company with its principal place of business located at 4-11 Higashi-shinagawa 2-chome, Shinagawa-ku, Tokyo, 140-8605, Japan. JAL conducts passenger air transportation throughout the world. During the Class Period, JAL sold air passenger fares to and from the United States and this District.

15.    Defendant Malaysia Airline System Berhad ("Malaysia Airlines") is a Malaysian company with its principal place of business located at Bangunan MAS, 33rd Fl., Jalan Sultan Ismail, 50250 Kuala Lumpur, Malaysia. Malaysia Airlines conducts passenger air transportation throughout the world. During the Class Period, Malaysia Airlines sold air passenger fares to and from the United States and this District.

16.    Defendant Northwest Airlines Corporation ("Northwest") is a Delaware corporation with its principal place of business located at 2700 Lone Oak Pkwy., Eagan, MN 55121. Northwest conducts passenger air transportation throughout the world. During the Class Period, Northwest sold air passenger fares to and from the United States and this District.

17.    Defendant Singapore Airlines Limited ("Singapore Airlines") is a Singaporean company with its principal place of business located at Airline House, 25 Airline Rd., 819829 Singapore. Singapore Airlines conducts passenger air transportation throughout the world. During the Class Period, Singapore Airlines sold air passenger fares to and from the United States and this District.

CLASS ACTION COMPLAINT

1    18.    Defendant Thai Airways International Public Co., Ltd. ("Thai Airways") is Thai

2    company with its principal place of business located at 89 Vibhavadi-Rangsit Rd. Bangkok,

3    10900, Thailand.  Thai Airways conducts passenger air transportation throughout the world.

4    During the Class Period, Thai Airways sold air passenger fares to and from the United States and

5    this District.

6                                    **AGENTS**

7    19.    The acts alleged to have been done by Defendants were authorized, ordered, or

8    performed by their directors, officers, managers, agents, employees, or representatives while

9    actively engaged in the management of Defendants' affairs.

10                          **UNNAMED CO-CONSPIRATORS**

11    20.    On information and belief, at all relevant times, other airlines (such as Qantas

12    Airways Limited – "Qantas"), entities, and/or persons willingly conspired with Defendants in

13    their unlawful restraint of trade.  All averments herein against Defendants are also averred against

14    these unnamed co-conspirators as though set forth at length.

15                       **INTERSTATE TRADE AND COMMERCE**

16    21.    Throughout the Class Period, there was a continuous and uninterrupted flow of

17    invoices for payment, payments, and other documents essential to the provision of passenger air

18    transportation transmitted in interstate and foreign trade and commerce between and among

19    offices of Defendants and their customers located throughout the world, including throughout the

20    United States.

21    22.    Throughout the Class Period, Defendants transported substantial numbers of

22    passengers, in a continuous and uninterrupted flow of interstate and foreign trade and commerce,

23    between various airports in the United States and foreign airports.

24    23.    Throughout the Class Period, Defendants unlawful activities, as described herein,

25    took place within and substantially affected the flow of interstate and foreign trade and commerce

26    and had a direct, substantial and reasonably foreseeable effect upon commerce in the United

27    States and elsewhere.

28

## FACTUAL ALLEGATIONS

**The Industry**

24.     Defendants are large, international passenger air carriers. Each Defendant provides passenger air transportation services on trans-Pacific routes to and from the United States.

25.     The international airline industry operates in a hub system where airlines assign strategic transfer locations in order to transport their customers to locations that are not served by direct flights. This system enables airlines to reach more markets than they could with their own direct point-to-point services. Because airlines can focus their resources in a few locations, they benefit from the efficiency of the hub system.

26.     Most airports can serve as a hub for only one or two airlines. Non-hub airlines provide only limited services to a competitors' hub, thereby insulating hub airlines from competition at their hub airports. Moreover, because of the volume of business that airlines provide at their hubs, they often receive preferential arrangements from their hub airports. As a result, airlines have a substantial amount of monopoly power on routes originating or terminating at their hubs.

27.     A January 2001 U.S. Department of Transportation ("DOT") publication reported on the disadvantage to consumers of the hub system:

> Network hubs are a central component of today's aviation infrastructure. ... From a consumer perspective, the primary disadvantage of the network hubs is the level of market power that the hub carrier is capable of amassing and the higher prices consumers pay as a result. This stems from the fact that no airline with a similar cost structure can compete effectively at another airline's hub. DOT and others have reported on the prevalence of high fares paid by passengers at hub airports dominated by a network carrier; indeed, no credible study concludes otherwise.

28.     The hub airlines' market power is even greater for international flights because, unlike for domestic flights, there is a lack of substantial competition from low fare airlines, particularly for trans-Pacific routes.

29.     In Asia, international flight hubs include among others: (1) Tokyo Narita

International Airport for ANA, JAL, and Northwest; (2) Osaka Kansai International Airport for ANA and JAL; (3) Taiwan Taoyuan International Airport for China Airlines and EVA Air; and (4) Singapore Changi International Airport for Singapore Air and Qantas.

30.    Some of the Defendants operate jointly through marketing alliances and code sharing agreements. For example, Singapore Air owns 25 percent of Air New Zealand. In addition, Defendants Air New Zealand, ANA, Singapore Air, and Thai Air are members of one of the most visible marketing alliances: the Star Alliance. Defendant JAL is now a member of that alliance. Similarly, Air New Zealand has code share agreements with Qantas and Singapore Air. Singapore Air is a code share partner with ANA, and JAL is a code share partner of Thai Air.

31.    These types of operating agreements create the potential for anticompetitive conduct, according to testimony by the Department of Justice's Antitrust Division before the Senate Committee on Commerce, Science and Transportation:

> [A]irline marketing alliances … are essentially joint ventures between airlines. These alliances fall somewhere between an outright merger and a traditional arm's-length interline agreement. Marketing alliances come in all shapes and sizes … Alliances involving code-sharing are in many respects the most controversial. They have the potential to be procompetitive -- they can create new service, improve existing service, lower costs and increase efficiency, all to the benefit of the traveling public. Code sharing agreements also have the potential to be anticompetitive. They can result in market allocation , capacity limitations, higher fares, or foreclosure of rivals from markets, all to the injury of consumers … the greatest threat to competition comes when two of very few airlines that compete in a market enter into a code-sharing agreement in that market.

32.    Defendants also have close business relationships and dealings through their participation in trade association. Each Defendant is a member of the International Air Transport Association ("IATA"). IATA is an international trade body representing over 240 airlines. IATA has served as a forum for its members to discuss rising fuel costs and the need for measures to mitigate such costs, such as increasing fares or levying fuel surcharges.

33.    In addition to their general memberships in the IATA, Singapore Air's CEO,

1    Chew Choon Seng, and JAL's President, Toshiyuki Shinmachi, serve on the IATA's Board.

2        34.    Each Defendant except Northwest is also a member of the Association of Asia

3    Pacific Airlines ("AAPA"). The AAPA is a regional trade association representing 17 major

4    airlines based in Asia Pacific. Like IATA, the AAPA has served as a forum for its members to

5    discuss rising fuel costs and the need for measures to mitigate such costs, such as increasing fares

6    or levying fuel surcharges.

7    **The Conspiracy**

8        35.    Between 1992 and 2002, profits from air passenger tickets, measured by revenue

9    per passenger mile, declined by over 30% mainly due to increasingly intense price competition.

10       36.    Since 2002, substantial fuel cost increases have put additional pressure on

11   passenger yields and airlines' profitability. After peaking in 2000, fuel prices declined for about

12   two years. In 2002, however, fuel costs began a period of exponential increases. Between 2004

13   and 2005, for example, fuel cost increased 43%. Between 2005 and 2006 fuel costs increased

14   50%.

15       37.    Airlines spend about 10% to 20% of their operating costs on fuel. The impact of

16   rising fuel costs on individual airline profits varies widely, depending on criteria such as fleet

17   utilization and efficiency. Singapore Airlines, for example has new, more fuel-efficient planes.

18   The impact of rising fuel also varies depending how much of projected fuel consumption was

19   committed to at a fixed price at the beginning of the year, a practice known as hedging. For

20   example, in 2004 and 2005, Singapore Airlines hedged about 33% of its fuel needs at US$32 per

21   barrel. Chinese carriers, such as China Airlines, on the other hand, are not allowed to hedge fuel

22   costs, making them more susceptible to swings in the market. Moreover, jet fuel prices in

23   mainland China are kept about 15% above the regional average.

24       38.    In late 2003, some airlines began imposing fuel surcharges, purportedly to cover

25   rising fuel costs. Previously, such surcharges were built into the base fare for a ticket.

26       39.    Beginning on or about January 1, 2004, notwithstanding the varying effects of

27   rising fuel costs on each Defendant, they began imposing increases that were lockstep in their

28

CLASS ACTION COMPLAINT

1  timing and amount.  The close timing and amount of Defendants' fuel surcharge increases were

2  not coincidences, but rather the product of a collusive agreement to fix, raise, maintain, and

3  stabilize prices on trans-Pacific flights.

4       40.    For example, on May 11, 2004, Qantas, announced fuel surcharges between US$4

5  and US$10 for tickets effective May 13, 2004.  The following day, May 12, 2004, Air New

6  Zealand that it would impose a fuel surcharge of US$12.2 per sector on long-haul international

7  services, effective May 17, 2004.  That same day, Cathay Pacific announced that it was

8  considering a fuel surcharge on ticket prices because of surging oil prices.  On June 7, 2004,

9  China Airlines began collecting a US$7 fuel surcharge

10       41.    On August 16, 2004, Cathay Pacific announced a fuel surcharge of US$19 per

11  passenger for long-haul flights to cover the cost of rising jet fuel prices until November 30, 2004.

12  On August 19, 2004, Singapore Airlines announced fuel surcharges on tickets for all flights

13  effective September 1, 2004.  The surcharge increases ranged from US$4 to US$12.  On August

14  20, 2004, Qantas announced that it would increase its fuel surcharges in international passenger

15  fares to US$16.  On August 26, 2004, Air New Zealand announced new fuel surcharge increase

16  $6 per sector on long-haul flights.

17       42.    On October 20, 2004, Air New Zealand announced a fuel surcharge increase of

18  $14 on all flights from New Zealand to Los Angeles, San Francisco and Honolulu as well as on

19  flights from Pacific Island locations to Los Angeles.  On November 1, 2004 EVA added a fuel

20  surcharge of US$17 on air passenger tickets.  On November 8, 2004, Singapore Airlines

21  announced that it would again increase prices for air passenger tickets for the second time in less

22  than six months due to increasing fuel prices, effective November 15, 2004.

23       43.    On February 1, 2005 ANA and JAL added a US$24 fuel surcharge on passenger

24  flights between North America and Japan.  On the same day, Singapore Airlines added a US$22

25  fuel surcharge on international air passenger tickets.

26       44.    On March 28, 2005, Qantas increased its fuel surcharges on international

27  passenger flights to US$35.  On April 6, 2005, Air New Zealand announced a US$8 increase in

28

fuel surcharges on long-haul passenger flights, effective April 12, 2005. On April 27, 2005, Singapore Airlines announced that it would increase its fuel surcharges on air passenger tickets to US$15 per sector for travel between Hong Kong and San Francisco and US$22 per sector for all other international flights effective May 1, 2005. That same day, Thai Airways announced that it would increase its fuel surcharges by US$5, effective May 1, 2005, for all intercontinental flights.

    45.    On July 1, 2005 ANA and JAL announced fuel surcharges on passenger air fares between North America and Japan. On July 7, 2005, Singapore Airlines announced that it would increase its fuel surcharges on passenger flights to the United States to $45, effective July 20, 2005. That month, Northwest also increased its fuel surcharges on passenger flights between Singapore and the United States to $45.

    46.    On August 1, 2005, Thai Airways increased its fuel surcharges to US$35 on international passenger flights including those to and from the United States. On August 22, 2005 Air New Zealand raised its fuel surcharges on international passenger flights to $92. The next day Qantas raised its surcharges to $75. That month Thai Airways again increased these surcharges by US$15. On October 13, 2005, Northwest increased its fuel surcharges on trans-Pacific flights to US$65.

    47.    On March 24, 2006, China Airlines and EVA announced that they would increase their fuel surcharge from US$32.5 to US$39 for long-haul passenger flights effective April 6, 2006. On April 21, 2006 Qantas raised its fuel surcharges to US$65 on international passenger flights. Three days later, Northwest raised its fuel surcharges to US$70.

    48.    On May 4, 2006, Air New Zealand announced that it would increase its fuel surcharges on passenger flights from Australia to the U.S. (excluding Perth, Australia) by $11 to $104 and Perth to USA by $16 to $138. On May 15, 2006, China Airlines increased its fuel surcharges to US$70 on passenger flights between Taiwan and the U.S. The next Day, EVA raised its fuel surcharges to US$65 on flights between Singapore and the U.S. On May 19, 2006, Singapore Airlines increased its fuel surcharges to US$90 on international passenger flights. And on June 1, 2006 Thai Airways increased its fuel surcharges to US$65 on passenger flights

CLASS ACTION COMPLAINT

1    between Bangkok and the U.S.

2        49.    On July 25, 2006, Northwest increased its fuel surcharges to US$90 on passenger

3    flights between Singapore and the U.S.  On August 24, 2006 China Airlines increased its fuel

4    surcharges on air passenger flights to and from the U.S. to US$90.  On August 31, 2006 Qantas

5    raised its fuel surcharges to $185 on international passenger flights.  On September 1, 2006, Thai

6    Airways increased its fuel surcharges on international passenger flights.  On September 7 of that

7    year Singapore Airlines raised its fuel surcharges on international flights to US$90.

8        50.    On October 1, 2006, ANA and JAL raised their fuel surcharges to US$ 113 on

9    trans-Pacific passenger flights.

10        51.    On January 1, 2007 ANA and JAL lowered their fuel surcharges on passenger

11    flights between Japan and North America to US$108.  On February 1, 2007 Singapore Airways

12    decreased its fuel surcharges on passenger flights between Singapore and the U.S. to US$91.

13        52.    On May 1, 2007 ANA and JAL again lowered their fuel surcharges to US$91 on

14    international passenger flights.

15        53.    On July 30, 2007 Northwest increased its fuel surcharges on passenger flights

16    between Singapore and The U.S. to US$115.  Effective August 1, 2007, Cathay Pacific

17    announced fuel surcharges of US$54.40 on passenger flights between Hong Kong and North

18    America.  Effective August 10, 2007 EVA announced US$103 in fuel surcharges on passenger

19    trans-Pacific flights to the U.S.

20        54.    On September 27, 2007, Cathay Pacific increased fuel surcharges HK$424 to

21    HK$428 for long-distance passenger flights.  On October 1, 2007 ANA and JAL raised their fuel

22    surcharges on passenger flights between Japan and the U.S.

23        55.    On November 7, 2007 Singapore Airways began to charge US$104 in fuel

24    surcharges on passenger flights between Singapore and the U.S.

25        56.    Reports from trade association meetings support the existence of a conspiracy to

26    impose and increase fuel surcharges.  For example, on May 27, 2004 Giovanni Bisignani,

27    Director General and CEO of IATA stated:

28

-11-                CLASS ACTION COMPLAINT

On average, fuel accounts for 16% of airline operating costs. Fuel prices are 55% higher than one year ago. This could add between US$8 and US$12 billion to our annual fuel bill and threatens to strangle our modest projected return to profitability. Instead of flying high, we could be left swimming in red ink ... The current crisis resulting from sky high fuel prices once again highlights the industry's vulnerability to external shocks. ... We need to build a new industry structure capable of withstanding external shocks and delivering sustained profitability.

57.    The next day, at an IATA Special Meeting in Geneva, the IATA board agreed to recommend a three percent price increase for intercontinental flights from Europe and five percent for those from other regions to cover rising fuel costs.

58.    In a June 3, 2004, press release, Giovanni Bisignani of IATA again raised the issue of high fuel prices:

While record high fuel prices challenge our profitability it is time to put our efforts towards rebuilding the industry. ... It is appropriate that we meet in Singapore at this critical time in our industry's history. Singapore is a leader of the aviation industry. Singapore's liberal aviation policy and its industry leading airline and airport provide and excellent backdrop for discussing our many challenges. I am confident that this AGM, more than any other, will result in a new direction for the industry.

59.    Between June 6 and 8, 2004, about 150 airline executives attended IATA's Annual General Meeting and World Air Transport Summit in Singapore. Rising fuel costs and IATA's recommended fare increases were the talk of the meeting. IATA CEO Giovanni Bisignani told attendees, "Last year we survived the four horsemen of the apocalypse: Sars, conflict in Iraq, terrorism and the economy. But a fifth horseman, the price of oil, could add up to US$ 1 billion per month to our costs and deny us profitability yet again."

60.    A September 20, 2005 IATA press release acknowledged that fuel surcharges were mitigating the impact of increased fuel costs: "Airlines are struggling to deal with a ballooning fuel bill that is expected to reach US$97 billion—more than double the US$44 billion in 2003. Efficiency gains, high load factors, and fuel surcharges are helping mitigate a portion of the impact of the extraordinary price of fuel."

61.    IATA data demonstrates that the imposition of fuel surcharges was a revenue

CLASS ACTION COMPLAINT

1   generator for the airlines, not simply a cost recovery mechanism.  In fact, the airlines' use of fuel

2   surcharges has allowed them to reach levels of profitability greater than when fuel prices were

3   much lower.

4       62.   For example, in an October 18, 2007 remarks at the World Air Transport Form,

5   Giovanni Bisignani of IATA stated, "The period since 2001 has been tough.  To survive, airlines

6   have been tough in response. … The results show in the bottom line: for the first time since 2000

7   airlines will turn a profit this year of US$5.6 billion."

8       63.   ANA reported a net profit of 7.68 billion yen for the first quarter of fiscal year

9   2006.  Thai Airways collected nearly US$80 million in fuel surcharges and reported profits in the

10   third quarter of 2006.  An August 10, 2006 article in The China Post quoted a securities analyst as

11   saying that "'[t]he higher fuel surcharge in place was also quite effective'" in raising Thai Air's

12   revenues.  Similarly, on August 28, 2007, Air New Zealand announced a net profit of NZ$214

13   million, up 123% from the previous year.  For the same period, Air New Zealand's  operating

14   costs increased by 13% while the number of passengers increased only by 4.9%.

15       64.   On August 7, 2007, The Japan Times reported that JAL's operating loss shrank

16   from 31.9 billion yen the prior year to 8.5 billion yen.  The article further stated, "JAL's executive

17   officer, attributed the improved earnings performance to the carrier's efforts to cut costs, brisk

18   business demand for international flights, higher revenue per passenger achieved through fare

19   hikes on domestic routes and increased fuel surcharges on international fights."

20       65.   On August 8, 2007, Cathay Pacific announced that its passenger revenue had

21   increased 14.6% for the first half of 2007, compared with the previous year.  The total number of

22   passengers increased by only 4.1%, but passenger yield was up 10.9%.

23       66.   A recent position paper from the Centre for Asia Pacific Aviation, a provider of

24   aviation market intelligence supports the conclusion that Defendants' were engaged in a

25   conspiracy to fix prices.  The paper states, "Higher fuel prices drove the flag carriers away from

26   the mindless chase after market share into a more considered quest for profitability."

27   **GOVERNMENT INVESTIGATIONS**

28

                          -13-                CLASS ACTION COMPLAINT

67.    On August 1, 2007, the United States Department of Justice ("DOJ") filed a criminal information against Korean Air in the United States District Court for the District of Columbia, charging it with violating Section 1 of the Sherman Act for engaging in the price fixing conspiracy alleged herein, as well as a price fixing conspiracy directed at air cargo rates.

68.    That same day, the DOJ announced that Korean Air had agreed to plead guilty and pay a $300 million fine for its participation in the two charged conspiracies.  In confirming that it had agreed to plead guilty, Korean Air attorney Ahn Yong-Seok announced that Korean Air "apologises [sic] to shareholders and customers for causing trouble."  He further stated that Korean Air's compliance officer would attempt to ensure future compliance with U.S. and global fair trade rules.  Subsequent news reports indicated that Asiana may also be subject to potential fines.

69.    On November 27, 2007, it was announced that Qantas had agreed to plead guilty to fixing prices for cargo shipment to and from the U.S. and elsewhere, in violation of Section 1 of the Sherman Act.

70.    On August 8, 2007, Cathay Pacific announced that it is the subject of antitrust investigations by competition authorities in various jurisdictions.

**FRAUDULENT CONCEALMENT**

71.    Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiffs and the Class.

72.    Plaintiffs and the members of the Class did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were violating the antitrust laws as alleged herein until shortly before this litigation was commenced.  Nor could Plaintiffs and the members of the Class have discovered the violations earlier than that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.  The conspiracy was by its nature self-concealing.

73.    Plaintiffs and the members of the Class could not have discovered the unlawful

1    conduct at an earlier date through the exercise of reasonable diligence because of Defendants'

2    active and purposeful concealment of their unlawful activities.

3        74.    Defendants engaged in a successful, illegal price-fixing conspiracy with respect to

4    passenger air transportation passenger fares and wholesale fares, which they affirmatively

5    concealed in at least the following respects:

6        a.    By agreeing among themselves not to discuss publicly, or otherwise reveal,

7    the nature and substance of the acts and communications in furtherance of the illegal scheme;

8        b.    By engaging in secret meetings, telephone calls, and other communications

9    in order to further their illicit cartel; and/or

10        c.    By giving false and pretextual reasons for their pricing of passenger fares

11    and/or fuel surcharges, and for the increases in those prices during the relevant period, and by

12    describing such pricing and increases falsely as being a result of external costs rather than

13    collusion.

14        75.    As a result of Defendants' fraudulent concealment of its conspiracy, Plaintiffs and

15    the members of the Class assert the tolling of any applicable statute of limitations affecting the

16    rights of action of Plaintiffs and the members of the Class.

17                    <u>CLASS ACTION ALLEGATIONS</u>

18        76.    Plaintiffs bring this action on behalf of themselves individually, and as a class

19    action pursuant to Rule 23(a) and (b) of the Federal Rules of Civil Procedure on behalf of the

20    following Class:

> All persons and entities that purchased passenger air transportation
> that included at least one trans-Pacific flight segment to or from the
> United States from one or more Defendant, at any time between
> January 1, 2004_the present. Excluded from the class are
> governmental entities, Defendants, any parent, subsidiary or
> affiliate thereof, and Defendants' officers, directors, employees and
> immediate families.

21

22

23

24

25

26    77.    Plaintiffs do not know the exact number of members of the Class because such

27    information is in the exclusive control of Defendant. Due to the nature of the trade and

28    commerce involved, however, Plaintiffs believe that Class members number at least in the

thousands and are sufficiently numerous and geographically dispersed throughout the United States and the world so that joinder of all Class members is impracticable.

78.    There are questions of law and fact which are common to the claims of Plaintiffs and the Class, including, but are not limited to:

a.    Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for passenger fares and/or fuel surcharges charged for trans-Pacific flights to and from the United States;

b.    Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for passenger fares and/or fuel surcharges charged for trans-Pacific flights to and from the United States;

c.    The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for passenger fares and/or fuel surcharges charged for trans-Pacific flights to and from the United States;

d.    Whether Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

e.    Whether Defendants fraudulently concealed the alleged conspiracy so as to equitably toll any applicable statute of limitations;

f.    Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

g.    Whether, and to what extent, the conduct of Defendants caused injury to Plaintiffs and members of the Class, and, if so, the appropriate measure of damages; and

h.    Whether Plaintiffs and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Section 1 of the Sherman Act alleged.

79.    Plaintiffs' claims are typical of the claims of the members of the Class.

80.    Plaintiffs will fairly and adequately assert and protect the interests of the Class.

-16-                    CLASS ACTION COMPLAINT

Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.

81.    Plaintiffs are represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

82.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

83.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

b.    The Class is readily definable and one for which records should exist in the files of Defendant.

c.    Prosecution as a class action will eliminate the possibility of repetitious litigation.

d.    Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

e.    Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

84.    This class action presents no difficulties of management that would preclude its maintenance as a class action.

## COUNT I

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

85.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

CLASS ACTION COMPLAINT

86.    Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of passenger fares and/or fuel surcharges for trans-Pacific flights to and from the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

87.    Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the prices of passenger fares and/or fuel surcharges for trans-Pacific flights to and from the United States.

88.    In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize passenger fares and wholesales fares.  These activities included the following:

a.    Agreeing to charge prices for passenger fares and/or fuel surcharges at certain levels and otherwise fix, raise, maintain and/or stabilize prices for passenger fares and/or fuel surcharges; and

b.    Charging passenger fares and/or fuel surcharges at agreed upon levels.

The illegal combination and conspiracy alleged herein had the following effects, among others:

c.    The prices charged by Defendants to, and paid by Plaintiffs and members of the Class for passenger fares and/or fuel surcharges were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

d.    Plaintiffs and members of the Class have been deprived of free and open competition in the purchase of trans-Pacific passenger air transportation to and from the United States;

e.    Plaintiffs and members of the Class have been required to pay more for trans-Pacific passenger air transportation to and from the United States than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy;

CLASS ACTION COMPLAINT

f.      Competition in the sale of trans-Pacific passenger air transportation to and from the United States has been restrained, suppressed or eliminated.

89.      As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and damaged in their business and property in an amount to be determined according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be give to members of the Class;

B.      That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C.      That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiffs and the Class;

D.      That the Court award Plaintiffs and the Class treble damages;

E.      That the Court award Plaintiffs and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

F.      That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

G.      That the Court award Plaintiffs and the Class such other and further relief as may

CLASS ACTION COMPLAINT

be deemed necessary and appropriate.

Dated: December 18, 2007                    Respectfully submitted,


By:  _/s/ Michael P. Lehmann_
        Michael P. Lehmann (71552)
        **COHEN, MILSTEIN, HAUSFELD**
        **& TOLL P.L.L.C.**
        One Embarcadero Center
        Suite 2440
        San Francisco, CA  94111
        Telephone:  (415) 623-2047
        Facsimile:   (415) 433-5994

        Michael D. Hausfeld
        Charles E. Tompkins
        James J. Pizzirusso
        Hilary K. Ratway (209451)
        Andrea L. Hertzfeld
        **COHEN, MILSTEIN, HAUSFELD**
        **& TOLL, P.L.L.C.**
        1100 New York Avenue, NW
        West Tower, Suite 500
        Washington, DC 20005
        Telephone:  (202) 408-4600
        Facsimile:   (202) 408-4699

        Allan Steyer (100318; asteyer@steyerlaw.com)
        **STEYER LOWENTHAL BOODROOKAS**
        **ALVAREZ & SMITH LLP**
        One California Street, Third Floor
        San Francisco, CA 94104
        Telephone:  (415) 421-3400
        Facsimile:   (415) 421-2234

-20-                                    CLASS ACTION COMPLAINT